1
2
3
4
5
6
7
8
9
10          UNITED STATES DISTRICT COURT
11          SOUTHERN DISTRICT OF CALIFORNIA
12

| | |
|---|---|
| 13  ALLEGRO VENTURES, INC., | ) Case No. 11-cv-2009-L(WVG) |
| 14          Plaintiff, | ) **ORDER:** |
| 15  v. | ) **(1) DENYING DEFENDANT'S** |
|  | ) **MOTION FOR SUMMARY** |
| 16  MICHAEL W. ALMQUIST, | ) **JUDGMENT [DOC. 18], AND** |
| 17          Defendant. | ) **(2) DENYING PLAINTIFF'S** |
|  | ) **MOTION FOR SUMMARY** |
| 18  | ) **JUDGMENT [DOC. 29]** |

19          On August 31, 2011, Plaintiff Allegro Ventures, Inc. ("AVI") filed its complaint against
20  Defendant Michael Almquist, seeking declaratory relief under general maritime law. This
21  admiralty action arises out of a dispute concerning whether Defendant was employed as a
22  seaman in service of Plaintiff's vessel when he suffered from a seizure that eventually led to the
23  discovery of a malignant brain tumor. Now pending before the Court are the parties' cross-
24  motions for summary judgment.

25          The Court found these motions suitable for determination on the papers submitted and
26  without oral argument. *See* Civ. L.R. 7.1(d.1). (Doc. 22.) For the following reasons, the Court
27  **DENIES** Defendant's motion for summary judgment (Doc. 18), and **DENIES** Plaintiff's cross-
28  motion for summary judgment (Doc. 29).

# I.    BACKGROUND

Plaintiff is incorporated in Nevada and owns the seventy-foot luxury motor yacht ALLEGRO ("M/Y ALLEGRO"). (Frey Decl. ¶ 2 [Doc. 29–2].) Plaintiff's President is Leo Frey, who is principally responsible for the ownership, operation, and maintenance of the M/Y ALLEGRO. (*Id.*) Defendant is a resident of Carlsbad, California, who works in the maritime industry and is licensed by the United States Coast Guard to operate up to 200-ton vessels for near-coastal voyages. (Almquist Decl. ¶¶ 1, 4 [Doc. 18-3].)

Since 1993, Defendant has been doing business as Almquist Yacht Management. (Almquist Dep., Vol. I, 63:17–20 [Doc. 29–7].) While using this fictitious business name, Mr. Almquist provides boat-maintenance and captain services to various yacht-owning clients in the Southern California area. (Almquist Decl. ¶ 4.) When servicing their yachts, Mr. Almquist charges clients an hourly rate plus expenses for all work performed on the vessels. (*Id.* ¶ 10.)  He also charges for his travel time if he is making an after-hours trip for a specific client. (*Id.*) Additionally, Mr. Almquist provides captain services to his clients at a flat rate of $300 per day, often for trips to Catalina Island or the area around San Diego Bay. (*Id.* ¶ 7.) For several of these clients, he considered himself the "designated captain," where he would have an agreement to regularly maintain and repair the client's luxury yacht as needed while it was docked, and then be available to take owners and guests out on voyages for his flat-rate fee. (*Id.* ¶ 4.) Mr. Almquist provided a similar combination of these services to AVI over a period of approximately twelve years, and it is this relationship that forms the basis of this dispute.


## A.    Mr. Almquist's Connection with the M/Y ALLEGRO

Mr. Almquist's relationship with the M/Y ALLEGRO began in 1999 when he was enlisted by Mr. Frey to fly to Seattle and sail as the yacht's deckhand on its initial voyage to a boat show in Newport Beach, California. (Almquist Decl. ¶ 5.) Afterwards, Mr. Almquist personally drove the vessel to San Diego, California, where it has since been operated from. (*Id.* ¶¶ 5–6). From the remainder of 1999 to November 2010, Mr. Almquist provided a mix of day-to-day captain and boat-maintenance services to AVI for the M/Y ALLEGRO. (*Id.* ¶ 6.)

During this time period, Mr. Almquist had the keys to the M/Y ALLLEGRO and maintained the vessel on his own schedule. (Frey Decl. ¶ 10; Almquist Dep., Vol. I, 109:8–12.) He performed the maintenance work that he decided was necessary and then billed AVI accordingly. (Almquist Dep., Vol. II, 178:3–8.) These maintenance decisions included what type of oil to use in the yacht's engines, what kind of filters to buy, how to repair the water maker, when to moor the boat, how many fenders and lines to put out, and whether to add an extra spring line in case of a storm. (*Id*. at 178:9–21.) Yet, if a significant maintenance task exceeded a threshold dollar amount, Mr. Almquist would need to obtain approval from Mr. Frey beforehand. (Frey Dep. 34:16–35.) Further, when the M/Y ALLEGRO was hauled out to a shipyard for repairs once every few years, Mr. Almquist would serve as the representative of the vessel and interact with the shipyard on AVI's behalf. (*Id*. at 35:8–18.) He also enlisted various third parties to help him maintain the vessel, such as a diver to remove marine growth from the bottom of the boat. (Frey Decl. ¶ 11.) On these instances, Mr. Almquist would pay these other parties and then later be reimbursed by Mr. Frey. (*Id*.)

Mr. Almquist provided his captain service to AVI on numerous occasions. (Almquist Decl. ¶ 6.) On these outings, he was usually required to wear a captain outfit and was referred to as the "the Captain" of the yacht. (*Id*. ¶ 8.) Mr. Almquist on these occasions was paid his flat-rate fee, reimbursed for food, and provided with room and board when at sea overnight. (*Id*. ¶ 9.) Through this service and his aforementioned maintenance work, Mr. Almquist estimates that he did "virtually all of the piloting, navigation, docking, and movement of the Allegro" from 1999–2010. (*Id*. ¶ 6.) Moreover, he considered himself the "permanent regular captain" of the M/Y ALLEGRO, and he took Mr. and Mrs. Frey and their guests out on the yacht "hundreds of times during the 12 year period before [his] accident." (*Id*.) These voyages included a trip to Mexico with Mr. Frey, excursions to Catalina Island and, more commonly, outings in and around San Diego Bay and Mission Bay. (*Id*. ¶ 7.) Taking the period from 2004–2008 for example, Mr. Almquist's United States Coast Guard Small Vessel Sea Service Form lists a total of 361 days spent aboard the vessel with an average time underway of eight hours per day and an average distance offshore of ten miles. (*Id*. Ex. 2.)

1    However, Mr. Almquist never signed an employment contract or maritime shipping

2    articles with AVI. (Almquist Dep., Vol. I, 58:11–25.) As with his other clients, Mr. Almquist did

3    not receive an annual or monthly salary for the services he provided to AVI. (*Id*. at 90:8–10.) He

4    was not issued a W-2 earnings form from AVI, and AVI did not withhold income tax or take

5    social security deductions from the sums it paid to Mr. Almquist. (Frey Decl. ¶ 6; Almquist

6    Dep., Vol. I, 91:20–24.) From 1999–2010, AVI also employed four other individuals as captains

7    to take the M/Y ALLEGRO out when Mr. Almquist had a conflict in his schedule. (Frey Dep.

8    22:15–23:8.) Further, Mr. Almquist states that he is self-employed, but that he also considered

9    himself employed by AVI at the time of his accident. (Almquist Dep., Vol. I, 11:18–22,

10   122:17–123:4.)

12   **B.    The Accident**

13       On Thursday, November 18, 2010, Mr. Almquist delivered the M/Y ALLEGRO to the

14   Shelter Island Boat Yard at the request of Mr. Frey for the vessel to be hauled out to receive its

15   biennial shipyard maintenance. (Almquist Decl. ¶ 13.) Mr. Almquist also returned to the

16   shipyard the next day for a few hours to check on the status of the haulout work. (*Id*.) Because

17   Mr. Frey wished to discuss what work was going to be performed on the vessel, he scheduled a

18   meeting with Mr. Almquist to meet him at the boatyard over the weekend. (*Id*. ¶ 14.) Mr.

19   Almquist agreed to meet Mr. Frey but planned to bill AVI for all of his driving and meeting time

20   because Sunday was not a traditional work day for him. (*Id*. ¶ 15.)

21       On that following Sunday, November 21, 2010, Mr. Almquist left his home in Carlsbad at

22   approximately 9:30 a.m. to meet Mr. Frey at the boatyard. (*Id*.) While heading south on the

23   Interstate Five highway, Mr. Almquist suffered a "seizure-like episode" and lost consciousness,

24   crashing his pickup on the side of the freeway. (*Id*.) Emergency services transported Mr.

25   Almquist to a hospital where he was treated for his injuries. (*Id*. ¶ 16.)

26       While receiving treatment, a brain scan was undertaken to discover the cause of the

27   seizure. (Almquist Decl. ¶ 16.) It revealed a small lesion in Mr. Almquist's left parietal lobe.

28   (*Id.*) Initially, doctors believed that the lesion may be some type of cerebral parasite. (*Id.*)

However, on May 13, 2011, a craniotomy was performed to remove the lesion, and subsequent lab analysis determined that the lesion was a metastatic melanoma brain tumor. (*Id.*) A second tumor was later discovered in Mr. Almquist's right lung. (*Id.*) Mr. Almquist has since undergone chemotherapy and has accrued in excess of $700,000 in medical expenses relating to his automobile injuries and cancer treatments. (*Id.* 18.) AVI initially paid Mr. Almquist's medical expenses for the craniotomy and lung biopsy after being informed that Mr. Almquist was possibly infected with a parasite while working for AVI. (*Id.* ¶¶ 16, 18.) But after discovery of the melanoma, a dispute has arisen concerning whether AVI is responsible for paying any further medical bills. (*Id.* ¶ 18.)

On August 31, 2011, AVI commenced this action against Mr. Almquist. In the complaint, AVI asserts two claims for relief. First, AVI seeks a declaratory judgment stating that Mr. Almquist was not employed as a seaman in service of the M/Y ALLEGRO and therefore is not entitled to maritime maintenance-and-cure benefits. (Compl. ¶¶ 15–18.) Second, AVI seeks a judicial declaration that there is no connection between the medical conditions that Mr. Almquist is currently being treated for and what was originally reported to AVI by Mr. Almquist. (*Id.* ¶ 20.) Mr. Almquist responded with a demand for a jury trial and two counterclaims for: (1) maintenance-and-cure benefits from AVI, and (2) the willful and arbitrary failure of AVI to pay maintenance and cure. (Answer ¶¶ 8–18 [Doc. 4].)

Mr. Almquist now moves for summary judgment on the complaint for declaratory relief, asserting that he was employed by AVI as a seaman in service of the M/Y ALLEGRO at the time of his accident as a matter of law. (Def.'s Mot. 13:24–14:2.) AVI responds with its own motion for summary judgment, arguing that the undisputed facts show that Mr. Almquist was both not employed and not a seaman at the time of his injury. (Pl.'s Mot. 1:18–2:9.) Both motions are opposed.

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and is entitled to judgment as a matter of law. *See*

Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 242, 252). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific

1    facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R.

2    Civ. P. 56(e)).

3         When making this determination, the court must view all inferences drawn from the

4    underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at

5    587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate

6    inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on

7    a motion for summary judgment." *Anderson*, 477 U.S. at 255.

8         The mere fact that the parties filed cross-motions "does not necessarily mean there are no

9    disputed issues of material fact and does not necessarily permit the judge to render judgment in

10   favor of one side or the other." *Starsky v. Williams*, 512 F.2d 109, 112 (9th Cir. 1975). "[E]ach

11   motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v.

12   Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Furthermore, the court must consider

13   evidence submitted in support of and in opposition to both motions before ruling on either one.

14   *Id.*

15

16   **III.   DISCUSSION**

17        Under the maritime doctrine of maintenance and cure, a vessel owner is obligated to

18   "provide food, lodging, and medical services to a seaman injured while serving the ship." *Lewis

19   v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001). Further, the vessel owner's obligation

20   to provide these benefits to an injured seaman extends through "the period when he is

21   incapacitated to do a seaman's work, and continues until he reaches maximum medical

22   recovery." *Aguilera v. Alaska Juris F?V, O.N.* 569276, 535 F.3d 1007, 1009 (9th Cir. 2008)

23   (quoting *Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962)) (internal quotation marks omitted).

24   This doctrine is one of several specific legal protections that are available to seamen but not to

25   other maritime workers. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995). As "the wards of the

26   admiralty" court, seamen receive these additional safeguards because they "are by the peculiarity

27   of their lives liable to sudden sickness from change of climate, exposure to perils, and

28   exhausting labor." *Id.* at 354–55 (quoting *Harden v. Gordon*, 11 F. Cas. 480, 483 (C.C.D. Me.

1  1823)) (internal quotation marks omitted). Therefore, as a broad protection for seamen,

2  maintenance and cure is designed to offset the "special hazards and disadvantages to which they

3  who go down to sea in ships are subjected." *Id*. at 355 (quoting *McDermott Int'l, Inc., v.*

4  *Wilander*, 498 U.S. 337, 354 (1991)) (internal quotation marks omitted).

5      When this protection applies, an injured seaman is entitled to three separate remedies

6  under general maritime law. *Lipscomb v. Foss Maritime Co.*, 83 F.3d 1106, 1109 (9th Cir.

7  1996). First, a seaman is entitled to "maintenance," which is a "daily stipend due to a seaman

8  during the period of his disability equivalent to the quality and value of food and lodging

9  provided to him aboard the vessel." *Moore v. United States*, 817 F. Supp. 2d 1136, 1150 (N.D.

10  Cal. 2011) (citing *McWilliams v. Texaco, Inc.*, 781 F.2d 514, 517 (5th Cir. 1986)). Second, a

11  seaman has the right to "cure," which encompasses "the reasonable medical expenses for

12  treatment until the seaman is fit for duty or until maximum recovery is reached." *Id*. (citing *Vella*

13  *v. Ford Motor Co.*, 421 U.S. 1, 5 (1975)). Third, if applicable, an injured seaman is also

14  guaranteed unearned wages from the onset of the injury until the end of the voyage. *Lipscomb*,

15  83 F.3d at 1109 (citing *Vella*, 421 U.S. at  3–4).

16      The vessel owner's duty to provide these remedies "is not related in any way to

17  negligence or fault of the shipowner, nor is it limited to cases where the seaman's employment is

18  the 'cause' of the illness." *Dragich v. Strika*, 309 F.2d 161, 163 (9th Cir. 1962) (citing *Callmer*

19  *S.S. Corp. v. Taylor*, 303 U.S. 525, 527 (1937)). The vessel owner's responsibility persists even

20  if the seaman engaged in negligent conduct. *Vella*, 421 U.S. at 4. But "some willful misbehavior

21  or deliberate act of indiscretion suffices to deprive the seaman of his protection." *Aguilar v.*

22  *Standard Oil Co.*, 318 U.S. 724, 731 (1943). The lack of limitations on this doctrine leads to it

23  generally protecting seamen as long as they are in the service of the vessel when the injury or

24  illness occurs. *E.g.*, *id*. at 732–33. Consequently, seamen are entitled to maintenance and cure

25  not only when they are injured at sea, but also when they are injured ashore, provided that they

26  are still in service of the vessel at that time. *See generally Williamson v. W. Pac. Dredging*

27  *Corp.*, 441 F.2d 65, 65–66 (9th Cir. 1995) (automobile accident during daily commute); *Macedo*

28  *v. F/V Paul & Michelle*, 868 F.2d 519, 529 (1st Cir. 1989) (injury during weekend "pleasure

1   jaunt"); *Archer v. Trans/Am. Servs., Ltd.*, 834 F.2d 1570 (11th Cir. 1988) (automobile accident
2   prior to departure of ship).

3       In order to be entitled to maintenance and cure, an injured party must first satisfy several
4   preliminary requirements. *See, e.g., Omar v. Sea-Land Serv., Inc.,* 813 F.2d 986, 988–89 (9th
5   Cir. 1987). Specifically, the injured party must have been an employee of the employer or vessel
6   owner at the time of the injury, and must also qualify as a "seaman" under maritime law. *Id*.
7   These requirements serve to identify sea-based maritime employees and then separate them from
8   land-based workers whose employment does not "regularly expose to them to the perils of the
9   sea." *See Chandris*, 515 U.S. at 348.

10      In this case, AVI and Mr. Almquist both contend that the undisputed facts establish each
11  of these two requirements in their favor, making summary judgment on the first claim for
12  declaratory relief appropriate. Because maintenance and cure is a no-fault remedy that covers
13  seamen as long as they are injured while in service of the vessel, AVI's second claim for
14  declaratory relief concerning what the injury was reportedly caused by is not determinative of
15  AVI's potential liability. *See Dragich*, 309 F.2d at 163–64. Consequently, this dispute in its
16  entirety initially depends on whether Mr. Almquist was employed as a seaman in service of the
17  M/Y ALLEGRO at the time of his injury. To make this determination, the Court will first
18  examine the existence of an employer-employee relationship between AVI and Mr. Almquist,
19  and then analyze whether Mr. Almquist is entitled to seaman status as a matter of law.

20

21      **A.    Existence of an Employer-Employee Relationship**

22      The existence of an employer-employee relationship is one precursor to a claim for
23  maintenance and cure. *Omar*, 813 F.2d at 989; *see also Cortes v. Baltimore Insular Line*, 287
24  U.S. 367, 371 (1932) (stating that the vessel owner's duty is one "annexed to the employment").
25  Generally, this requirement is not disputed when claims concerning a seaman's rights are
26  adjudicated, and the employer instead asserts that an injured employee is not a seaman. *E.g.*,
27  *Scheuring v. Traylor Bros., Inc.* 476 F.3d 781, 783 (9th Cir. 2007).  However, when this
28  requirement is being contested, its existence must be determined under maritime law. *United*

*States v. Webb, Inc.* 397 U.S. 179, 191–194 (1970); *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 795 (1949). Accordingly, this determination is approached similarly regardless of whether it is presented in the context of a seaman's rights claim brought under either the Jones Act or general maritime law. *Compare Glynn v. Roy Al Boat Mgmt. Corp.*, 57 F.3d 1495, 1499 (9th Cir. 1995) (Jones Act and maintenance and cure), *abrogated in part on other grounds by Alt. Sounding Co. v. Townsend*, 557 U.S. 404 (2009) *with Wheatley v. Gladden*, 660 F.2d 1024, 1026 (4th Cir. 1981) (maintenance and cure). Additionally, whether an employer-employee relationship exists under maritime law is "usually a question of fact for the jury, so long as there is an evidentiary basis for its consideration." *Glynn*, 57 F.3d at 1498 (citing *Omar*, 813 F.3d at 989). That said, this determination can be made as a matter of law when a reasonable jury could reach only one conclusion. *See id.* at 1499.

   "While there is no settled set of criteria for determining" whether an employment relationship exists, "the Supreme Court has indicated that '[o]ne must look at the venture as a whole.'" *Glynn*, 57 F.3d at 1495 (quoting *McAllister*, 337 U.S. at 795). Terms such as "employer, agent, [and] independent contractor are not decisive." *McAllister*, 337 U.S. at 795. The Ninth Circuit has followed this guidance by using a series of factors that focus on the degree of control exercised by the alleged employer over the injured party. *Glynn*, 57 F.3d at 1495. Factors to be considered include "payment, direction, supervision, and source of the power to hire and fire." *Id.* (citing *Matutute v. Lloyd Bermuda Lines, Ltd.*, 931 F.2d 231, 236 (3d Cir. 1991); *accord Boy Scouts of Am. v. Graham*, 86 F.3d 861, 865 (9th Cir. 1996) (citing *Heath v. Am. Sail Training Ass'n*, 644 F. Supp. 1459, 1468 (D.R.I. 1986)). Other factors include considering who has the power to determine the route of the ship and the activities of its crewmembers. *See McAllister*, 337 U.S. at 795.

   Under these factors, a person who signs onto a vessel as a crewmember and has minimal control over the venture's operation is in an employer-employee relationship as a matter of law. *Glynn*, 57 F.3d at 1498–00. In *Glynn*, the plaintiff fisherman Glynn brought suit under general maritime law and the Jones Act for injuries allegedly suffered as a crew member on board a vessel owned by the defendant Roy Al Boat Management Corporation. 57 F.3d at 1497. The

undisputed evidence revealed that Glynn had acknowledged in writing that he was signing onto a vessel owned by Roy Al and that his term of employment would begin upon signature and continue until he gave notice or was terminated for cause. *Id.* at 1499. Based on this evidence, the district court determined prior to trial that Roy Al was Glynn's employer as a matter of law. *Id*. After the jury returned verdicts against both Roy Al and the vessel's captain, Roy Al argued on appeal that the district court erred in not allowing the jury to decide the employment question because the jury "could have found that Glynn was a joint venturer or independent contractor, not an employee." *Id*. at 1498. In making this argument, Roy Al emphasized that the vessel's crewmembers were compensated based on a percentage of net profits, the crew received deductions in their pay when they were provided with equipment, and the vessel's captain considered himself to be self-employed. *Id*. The Ninth Circuit applied the aforementioned factors and affirmed the district court's determination that Glynn was Roy Al's employee. *Id.* at 1499. The court reasoned that Glynn was an employee because he could not control the vessel's destinations and did not have a say in the management or operation of the boat. *Id.* Furthermore, Roy Al did have the power to hire and fire him under the signed agreement. *Id*.

In contrast, a temporary and self-employed ship pilot who is compulsorily assigned to a vessel is not in an employer-employee relationship. *Evans v. United Arab Shipping Co. S.A.G.; M/V AL WATTYAH*, 4 F.3d 207, 209–10 (3d Cir. 1993). In *Evans*, the plaintiff Evans was a river pilot licensed by the United States Coast Guard and hired to steer ships through the Delaware River and Bay. *Id*. at 210. He was also a member of a pilot's association and paid federal income taxes as a self-employed individual. *Id*. While on call at the pilot station, Evans was assigned to pilot the defendant's container vessel through Delaware's territorial waters pursuant to state law. *Id*. at 210–11. After reaching Maryland and upon disembarking from the ship, Evans fell and suffered multiple physical injuries. *Id*. at 211. He subsequently brought suit under general maritime law and the Jones Act to recover against the defendant vessel owner. *Id*. at 209. The district court found that Evans was covered by the Jones Act as a seaman who was employed by the vessel at the time of his injury. *Id*. On appeal, the defendant argued that Evans could not bring suit because he was an independent contractor, which was shown by his self-employed

taxpayer status and other evidence. *Id.* at 217. In applying an identical set of control factors, the Third Circuit reversed the district court and held that Evans was not an employee under maritime law. *Id.* at 219. In doing so, the Third Circuit highlighted that Evans stated in his deposition that he was self-employed and that the vessel owner had no discretion in hiring or firing him. *Id.* at 218. Further, Evans was in supreme command of the vessel while he was navigating it. *Id.* at 218–19.

If the undisputed evidence reveals a combination of these factors that falls in between these two benchmarks, however, then summary judgment is inappropriate. *See Graham*, 86 F.3d at 865. In concurrently addressing this issue and the question of seaman status, the Ninth Circuit in *Graham* applied the set of control factors to the volunteer plaintiff's relationship with the defendant vessel owner. *Id.* at 862–63, 865. Despite the fact that the plaintiff was not paid by the defendant, the Ninth Circuit held that a genuine issue of material fact existed because the evidence also indicated that the defendant's skipper controlled the plaintiff's conduct while he was on the vessel and had the authority to select and dismiss him. *See id.* at 865; *see also Cowley v. Sunset Yacht Charters, Inc.*, No. 10–61928–CIV, 2011 WL 2938431, at *12 (S.D. Fla. July 19, 2011) (denying summary judgment when defendant charter company controlled the vessel's operating schedule, controlled plaintiff's work schedule, and possessed the power to terminate plaintiff); *Corsair v. Stapp Towing Co.*, 228 F. Supp. 2d 795, 799 (S.D. Tex. 2002) (rejecting defendant's independent-contractor argument at the summary-judgment stage when presented with competing contentions regarding control); *Isrow v. "A Modo Mio"*, 112 F. Supp. 2d 641, 644 (E.D. Mich. 2000) (ultimately granting summary judgment but finding an issue of material fact on this issue when defendants had the discretion to hire and fire plaintiff and the ability to supervise and control plaintiff's work to some degree).

Here, the Court finds that a genuine issue of material fact exists as to whether an employment relationship existed under maritime law. In supporting his contention that he was employed as the permanent captain of the M/Y ALLEGRO, and in opposing AVI's cross-motion, Mr. Almquist relies on the following evidence, among others: (1) the vessel insurance-policy applications signed by Mr. Frey from 2006–2010 that list Mr. Almquist as the licensed

"skipper" of the M/Y ALLEGRO; (2) a yacht insurance policy that includes coverage  for

maintenance and cure for a maximum of one "crew"; and (3) statements from Mr. Almquist's

declaration that he was at all times under the control and direction of Mr. Frey, he was paid

directly by AVI, Mr. Frey had the power to hire and fire him at any time, and he spent more time

working for AVI than any other yacht owner and considered it his primary employer. (Def.'s

Mot. 6:7–8:8, 11:3–12:15.)

    In opposition and its own motion for summary judgment, AVI argues that Mr. Almquist

was indisputably a self-employed independent contractor at the time of his injury. (Pl.'s Mot.

9:2–10.) AVI relies on evidence that includes: (1) deposition testimony and a separate

declaration where Mr. Almquist states that he is self-employed and that he operates a business

under the name Almquist Yacht Management; (2) invoices showing that Mr. Almquist provided

services to at least eleven different yacht owners in 2009 and 2010; and (3) deposition testimony

that reveals Mr. Almquist set his own work schedule, received little input or supervision from

Mr. Frey, and employed a number of subcontractors to carry out his maintenance tasks. (Pl.'s

Mot. 1:22–2:16, 4:1–10.)

    When viewing the evidence in the light most favorable to the corresponding opposing

party, neither party is entitled to judgment as a matter of law on this issue. Beginning with

Defendant's motion, Mr. Almquist's evidence establishes that he was paid by AVI, he was hired

by and could be fired by AVI, and his conduct was controlled to some degree by AVI. This

undisputed evidence establishes two of the factors—payment, and the source of the power to

hire and fire—in Mr. Almquist's favor. Yet, even if AVI does not dispute that it paid Mr.

Almquist and had the power to hire and fire him, AVI's independent-contractor argument and its

evidentiary support is essentially an attack on the degree of supervision and direction that AVI

had over Mr. Almquist, the two other factors that remain to be considered. (*See* Pl.'s Opp'n to

Def's Mot. 11:1–14:12.) Mr. Frey's statements also contradict Mr. Almquist's statements

regarding his understanding of their relationship. (Frey Decl. ¶¶ 8–10; Almquist Decl. ¶¶ 8–9.)

Unlike *Glynn*, where an employment relationship existed as a matter of law, Mr. Almquist did

not sign an employment contract and did have the ability to influence the operation of the yacht

1    through discretionary decisions related to his yacht-maintenance and captain activities.

2    Moreover, it is not enough to show that Mr. Frey indisputably exercised some control over some

3    of Mr. Almquist's actions because the "control which is exercised must be substantial." *See*

4    *Volrakis v. M/V Isabelle*, 668 F.2d 863, 866 (5th Cir. 1982), *overruled on other grounds by In Re*

5    *Air Crash Disaster Near New Orleans*, 821 F.2d 1147, 1163 n.25 (5th Cir. 1987.)

6           AVI's motion for summary judgment similarly fails to show the absence of a genuine

7    factual dispute. AVI argues that Mr. Almquist is an independent contractor by emphasizing his

8    statement that he is self-employed, but these terms are not decisive because the issue of

9    employee status depends on substance and not form. *See McAllister*, 337 U.S. at 795; *see also*

10   *Corsair,* 228 F. Supp. 2d at 798 (stating that a signed form where the injured party attested to

11   being an independent contractor would not be decisive on this issue). Likewise, that AVI did not

12   withhold income taxes or make deductions for social security from Mr. Almquist's

13   compensation is not determinative of his employment status. *See Evans*, 4 F.3d at 217 n.11;

14   *Corsair*, 288 F. Supp. 2d at 799. Mr. Almquist's statements and tax treatment initially align this

15   case with *Evans*, where the court held there was no employment relationship in part on these two

16   facts. However, AVI's evidence falls short of establishing a similar lack of control because AVI

17   selected Mr. Almquist, possessed the power to terminate his services, and controlled at least

18   some of his conduct while he performed his maintenance tasks and navigated the vessel. Mr.

19   Almquist's statements provided in opposition to AVI's motion also dispute AVI's portrayal of

20   his working relationship. (Almquist Opp'n Decl. ¶¶ 8–9.)

21          As a result, this Court is left with competing contentions in each motion about the degree

22   of control exercised over Mr. Almquist's services and what the parties understood their

23   relationship to be. This disagreement is suffused with factual nuances unsuitable for resolution at

24   the summary-judgment stage. Accordingly, the Court **DENIES** Mr. Almquist's motion for

25   summary judgment on the complaint for declaratory relief. Because AVI's motion for summary

26   judgment must be granted if the undisputed facts show that Mr. Almquist cannot satisfy the

27   supplemental seaman requirement, the Court will next address Mr. Almquist's seaman status.

28   //

**B.     Seaman Status**

As with other seaman's remedies and the Jones Act's protections, the right to maintenance and cure does not automatically extend to all maritime employees, but rather only to employees who qualify for "seaman" status under maritime law. *Chandris*, 515 U.S. at 368. Therefore, the test for seaman status for a maintenance-and-cure claim under general maritime law is the same as it is for actions brought under the Jones Act. *See Scheuring*, 476 F.3d at 784 n.3; *see also Fink v. Shepard S.S. Co.*, 337 U.S. 810, 815 (1949) (holding that the liability for "maintenance and cure depends on the same relationship that is required to support an action for negligent injury" under the Jones Act). A two-prong test set forth by the Supreme Court in *Chandris* is used to determine whether an injured claimant is a seaman and therefore entitled to any of the heightened safeguards under maritime law. *Keller Found./Case Found. v. Tracy*, 696 F.3d 835, 841 (9th Cir. 2012) (citing *Chandris*, 515 U.S. at 356, 368).

"First, the employee's duties must contribute to the function of the vessel or to the accomplishment of its mission." *Tracy*, 696 F.3d at 841 (citing *Chandris*, 515 U.S. at 368) (internal quotation marks and alterations omitted). This initial requirement is broad, and "all who work at sea in the service of a ship are eligible for seaman status." *Id*. at 841–42 (citing *Chandris*, 515 U.S. at 368) (internal quotation marks omitted).

Second, the "purported seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Tracy*, 696 F.3d at 842 (citing *Chandris*, 515 U.S. at 368). The Supreme Court additionally clarified that "[w]hen the inquiry further turns on whether the employee has a substantial connection to an identifiable group of vessels, common ownership or control is essential[.]" *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 558 (1997). The purpose of this second requirement is to "separate the sea-based maritime employees" from the "land-based workers who only have transitory or sporadic connection to a vessel in navigation." *Tracy*, 696 F.2d at 842 (quoting *Chandris*, 515 U.S. at 368) (internal quotation marks omitted). An appropriate rule of thumb for this requirement is that "a worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman[.]" *Id*. (quoting *Chandris*,

515 U.S. at 371) (internal quotation marks omitted). Moreover, "in evaluating the employment-related connection of a maritime worker to a vessel in navigation, courts should not employ 'a snapshot test for seaman status, inspecting only the situation as it exists at the instant of injury; a more enduring relationship is contemplated[.]'" *Chandris*, 515 U.S. at 363 (quoting *Easley v. S. Shipbuilding Corp.*, 965 F.2d 1, 4–5 (5th Cir. 1992)). Lastly, seaman status is not to be based on an employee's job title, but instead on the employee's actual duties. *Papai*, 520 U.S. at 558 (quoting *S. Chicago Coal & Dock Co. v. Bassett,* 309 U.S. 251, 60 (1940)).

Under this two-prong test, the determination of who is a seaman is a mixed question of fact and law. *Scheuring,* 476 F.3d at 785 (citing *Chandris*, 515 U.S. at 369). It is the court's duty to define the appropriate legal standard, but if reasonable persons could differ in applying the standard, then the determination is a question for the jury. *Chandris*, 515 U.S. at 369. The jury should be permitted to consider "all relevant circumstances" bearing on the two requirements set forth above. *Id.* Nevertheless, where the "undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may take the question from the jury by granting summary judgment or a directed verdict." *Chandris*, 515 U.S. at 371.

In further examining the second prong of the test, a maritime employee who has a transitory connection with a series of vessels not under common ownership or control is not entitled to seaman status as a matter of law. *Papai*, 520 U.S. at 559–60. In *Papai*, the plaintiff Papai was injured while painting the housing structure of a tug boat operated by the defendant. *Id*. at 551. The defendant had hired Papai for the one-day painting job through a local union hall, and the defendant had also employed him on twelve previous occasions in the two and a half months before his injury. *Id*. Further, all of Papai's jobs from the union hall were short term, but he stated that seventy percent of his work over the previous two and a half years was deckhand work aboard vessels. *Id* at 551, 559. The district court determined that Papai was not a seaman, but the Ninth Circuit reversed and remanded for a trial of his seaman status because it felt that a reasonable jury could conclude that Papai satisfied the two-part *Chandris* test. *Id*. at 552. In overturning the circuit court, the Supreme Court held that Papai was not entitled to seaman status because he could not show the requisite substantial connection to an identifiable fleet of vessels

that were under common ownership or control. *Id*. at 556–60. That various employers of Papai had joined together to create a common labor pool was insufficient to show common ownership or control of the vessels. *Id*. at 557. Moreover, Papai's previous three or four engagements with the defendant involved only maintenance work while the tug boat was docked. *Id*. at 559. Papai could not identify specifically what he did for the defendant in the other eight or nine times he worked for the company, but "in any event, these discrete engagements were separate from the one in question, which was the sort of 'transitory or sporadic' connection to a vessel or group of vessels that . . . does not qualify one for seaman status." *Id*. at 560 (quoting *Chandris*, 515 U.S. at 368).

While applying the Supreme Court's guidance from *Papai,* a district court in *Haskell v. M/V Alcazara* faced facts similar to the case at hand. No. 99-6208-CIV, 2000 U.S. Dist. LEXIS 20119, *3–5 (S.D. Fla. July 28, 2000). In that case, the plaintiff was injured while cleaning a sixty-one foot yacht owned by the defendant. *Id*. at *1. The plaintiff was being compensated hourly to perform maintenance tasks that were similar to Mr. Almquist's, including washing the yacht and checking its lines, power supply, and bilge pumps. *Id*. The plaintiff was also earning income from a separate company and from maintaining another luxury yacht at the time of her injury. *Id*. at *3–4. Although the plaintiff had been a past crew member of the yacht while it was under different ownership, she never went to sea aboard the yacht while the defendant owned it and was compensating her. *Id*. at *1, 4. Additionally, her hourly responsibilities for the other yacht that she maintained were greater than that for the defendant's yacht. *Id*. at *4. In considering the substantial-connection prong of the *Chandris* test, the court found that she was not entitled to seaman status for two reasons. *Id*. *8–10. First, the plaintiff admittedly spent more of her time in service of another yacht that was not under common ownership and was also working for a healthcare company. *Id*. at *8–9. Second, there was no evidence that the plaintiff was ever exposed to or even had an expectation to be exposed to the perils of the sea while working for the yacht's new owner. *Id*. at *9–10.

//

//

Here, the Court finds that an issue of material facts exists as to Mr. Almquist's seaman status. First, assuming, *arguendo*, that Mr. Almquist was employed by AVI, Mr. Almquist's services in maintaining the M/Y ALLEGRO and captaining it on its voyages satisfy the first requirement of the *Chandris* test because his work contributed to the function of a vessel while it was in navigation. *See Scheuring*, 476 F.3d at 787 (demonstrating this broad requirement by reversing a grant of summary judgment against plaintiff when plaintiff crane operator on a practically stationary barge performed some seaman duties on at least three occasions when the barge was unmoored and moved by a tug boat). Further, although the yacht was hauled out for maintenance during the weekend that Mr. Almquist was injured, "a vessel does not cease to be a vessel when she is not voyaging, but is at anchor, berthed, or dockside, [or] even when the vessel is undergoing repairs." *Chandris*, 515 U.S. at 373–74 (internal citations and quotation marks omitted). For these reasons and this Court's denial of summary judgment on the employer-employee-relationship issue, AVI must show that Mr. Almquist cannot satisfy the second prong of the *Chandris* test that requires a substantial connection to a vessel in navigation in order to prevail at this stage.

In striving to show that Mr. Almquist fails the second prong of the *Chandris* test even if he was an employee, AVI uses Mr. Almquist's invoices from the years 2009 and 2010 to argue that he is not entitled to seaman status as a matter of law because he did not spend at least thirty percent of an average 2000-hour work year in service of AVI's vessel. (Def.'s Mot. 14:22–15:12.) In doing so, AVI relies on several cases from the Fifth Circuit that apply the thirty percent rule of thumb and its associated fleet doctrine, which is the aforementioned requirement that if employees work on multiple vessels for their employers, then these vessels must be under common ownership or control. (*Id.* at 14:1–11, 14:22–15:12.) Mr. Almquist in opposition contends that this is an improper application of the thirty percent rule because the rule instead tests the percentage of time that an employee is in service of a vessel (or a fleet of vessels under common ownership or control) while working for that specific employer. (Def.'s Opp'n 17:20–18:1.) Under this interpretation, Mr. Almquist asserts that the test is satisfied because he spent an estimated ninety-five percent of his time while working for AVI aboard the M/Y

1   ALLEGRO "performing traditional vessel-related seaman's activities while the vessel was 'in-

2   navigation' upon the navigable waters of San Diego Bay." (Almquist Opp'n Decl. ¶ 10 [Doc. 30-

3   1].)

4      An examination of cases applying this rule reveals that Mr. Almquist's interpretation is

5   the correct one. In *Roberts v. Cardinal Services, Inc.*, one of the cases that AVI relies upon, the

6   court applied the thirty percent rule to a scenario where the injured plaintiff spent at most nearly

7   twenty-eight percent of his time working for the defendant on vessels under the defendant's

8   common ownership or control. 266 F.3d 368, 377 (5th Cir. 2001). Instead, the plaintiff spent the

9   majority of his time working for the defendant on stationary platforms and in a shop on land. *Id*.

10  at 376. The court held that he was not entitled to seaman status as a matter of law because he did

11  not spend at least thirty percent of his employment serving vessels under the defendant's

12  common ownership or control. *Id*. at 378; *see also Landry v. Specialty Diving of Louisiana, Inc.*,

13  299 F. Supp. 2d 629, 631, 634 (E.D. La. 2003) (applying *Roberts* and not finding seaman status

14  when plaintiff worked a total of 596.5 hours for defendant, with 314.5 of these 596.5 hours

15  aboard vessels in general, but only 29 hours, which was less than five percent, aboard vessels

16  owned by defendant).  As seen, this rule's percentage is computed by comparing the time spent

17  serving a vessel while working for an employer with the total time spent with that employer.

18     This distinction is implicit in *Papai* as well, where the Supreme Court approvingly cites

19  of the Fifth Circuit's percentage-based inquiry. *Papai*, 520 U.S. at 557. The Supreme Court does

20  not apply AVI's interpretation, which would have meant that when considering that Papai only

21  worked for the defendant on twelve occasions in the previous six months, he would have not

22  been entitled to seaman status simply because he did not spend at least thirty percent of an

23  average amount of work hours for a six-month period in service of the defendant's vessels. *See*

24  *id*. at 556–60.  Rather, although the plaintiff spent the majority of his time on vessels under the

25  defendant's control while working for the defendant, the Supreme Court held he was not entitled

26  to seaman status as a matter of law under the *Chandris* test because his connection to these

27  vessels based on twelve occasions in the previous six months was transitory or sporadic and

28

1  primarily not of a seagoing nature, reaching the same conclusion that AVI would but through a

2  different analytical framework. *See id*. at 558–60.

3  Therefore, this Court follows *Papai*'s guidance to not consider "prior employments with

4  independent employers in making the seaman-status inquiry" because the multiple yachts that

5  Mr. Almquist worked on were not under common control. *See id*. at 558. However, this Court

6  will not follow this guidance by adjusting the thirty percent rule to depend on a guideline total

7  possible number of hours spent working for all employers. Instead, because here Mr. Almquist

8  satisfies the thirty percent rule in regards to AVI, the focus must be on whether only the work

9  Mr. Almquist performed for AVI in service of the M/Y ALLEGRO constitutes the "sort of

10 'transitory or sporadic' connection" that is insubstantial as a matter of law. *See id*. at 560

11 (quoting *Chandris*, 515 U.S. at 368.) Additionally, although AVI stresses that Mr. Almquist's

12 activities in the several days leading up to his accident should be given the most weight, the

13 examination of Mr. Almquist's connection to the M/Y ALLEGRO is not limited to these events

14 because the type of work that Mr. Almquist has been performing for AVI has not changed since

15 their relationship began in 1999. *See Chandris*, 515 U.S. at 372. This approach comports with

16 the instruction to not employ a "snapshot test" for seaman status because a "more enduring

17 relationship is contemplated." *See id*. at 363 (quoting *Easley v. S. Shipbuilding Corp.*, 965 F.2d

18 1, 5 (5th Cir. 1992)) (internal quotation marks omitted).

19 In using this approach, this Court finds that a reasonable jury could conclude that Mr.

20 Almquist's connection to the M/Y ALLEGRO was substantial in terms of both duration and

21 nature for several reasons. First, Mr. Almquist performed various sea-based services to AVI for

22 the M/Y ALLEGRO over the course of twelve years, which could satisfy the substantial-

23 duration requirement. Second, although AVI asserts that it enlisted Mr. Almquist to take out the

24 yacht only a few times a month, the evidence shows that Mr. Almquist, in at least a period from

25 2004-2008 for example, spent as little as two but as many as eleven days per month underway on

26 the vessel for an average of eight hours per day and a distance offshore of ten miles. (*See*

27 Almquist Opp'n Decl. Ex. 2.) With the average days spent underway falling in between these

28 two extremes, the M/Y ALLEGRO being maintained and captained by Mr. Almquist on nearly

1    all of its voyages, and Mr. Almquist's work for the M/Y ALLEGRO being the largest

2    component of his maritime work, a reasonable jury could find that Mr. Almquist's connection to

3    the vessel was of a substantial nature.

4          Additionally, Mr. Almquist's connection to the vessel in this case is distinguishable from

5    that in *Papai*. Mr. Almquist's interactions with the vessel over a period of twelve years were not

6    "discrete engagements" like the twelve prior engagements at issue in *Papai*. *See id*. Mr.

7    Almquist had an understanding with Mr. Frey to continuously maintain the vessel, and he also

8    captained the vessel on nearly all of its outings during this twelve-year period. (Almquist Opp'n

9    Decl. ¶¶ 5–6.) Further, unlike *Papai*, a significant portion of Mr. Almquist's engagements with

10   the M/Y ALLEGRO did take him out to sea. (*Id.* ¶¶ 6–7.)

11         Moreover, Mr. Almquist's connection to the M/Y ALLEGRO is contrary to the yacht-

12   maintenance worker's relationship in *Haskell*. While the maintenance worker there had not been

13   out to sea with the yacht's current owner and did not expect to do so, Mr. Almquist did so here

14   and did have an expectation to continue to be enlisted to take the vessel out on its voyages. (*See*

15   Almquist Opp'n Decl. ¶¶ 6–8.) Also, although Mr. Almquist worked less for AVI in 2010 than

16   in previous years, he states that AVI was still "by far my largest single employer." (*Id.* ¶ 4.) He

17   also states that in "previous years when the Freys used the vessel more often," AVI alone

18   constituted the majority of his hourly and daily captain's rate earnings. (*Id.*) These facts further

19   distance this case from *Haskell* because there the injured plaintiff's responsibilities for another

20   yacht were more significant than for the defendant's yacht.

21         Ultimately, the undisputed facts do not reveal that Mr. Almquist "has a clearly inadequate

22   temporal connection" to a vessel in navigation that warrants denying him seaman status as a

23   matter of law. *Chandris*, 515 U.S. at 371. Accordingly, a "jury should be permitted . . . to

24   consider all relevant circumstances bearing on the two elements above" to make this

25   determination. *See id*. at 369. Therefore, the Court **DENIES** AVI's motion for summary

26   judgment.

27   //

28   //

21

**IV.     CONCLUSION & ORDER**

In light of the foregoing, the Court **DENIES** Defendant's motion for summary judgment (Doc. 22), and **DENIES** Plaintiff's cross-motion for summary judgment (Doc. 29).

**IT IS SO ORDERED.**

DATED: June 6, 2013

_____
M. James Lorenz
United States District Court Judge

COPY TO:

HON. WILLIAM V. GALLO
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL